UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SHAN ZHAO,

                            Plaintiff,

v.

KALEIDA HEALTH AND AARON KOPINSKI,

                            Defendants.

**REPORT, RECOMMENDATION AND ORDER**

04-CV-0467C(M)

---

This case was referred to me by Hon. Richard J. Arcara, to hear and report in accordance with 28 U.S.C. §§636(b)(1)(A), (B) and (C) (Dkt. ##4, 71). Before me are defendants' motions for summary judgment (Dkt. ##42, 48), plaintiff's cross-motion for partial summary judgment (Dkt. #57), and defendants' motions to strike plaintiff's expert report (Dkt. ##72, 76).[1]  Oral argument was held on June 6, 2007. For the following reasons, I recommend that defendants' motions (Dkt. ##42, 48) be GRANTED, and that plaintiff's cross-motion (Dkt. #57) be DENIED, and I order that defendants' motions (Dkt. ##72, 76) be GRANTED.

## BACKGROUND

Plaintiff Shan Zhao immigrated to the United States from China with her husband Ran Tao in March 1999 in order to attend graduate school (Dkt. #57-5, Ex. E, ¶4). After obtaining her MBA degree, plaintiff was hired by defendant Kaleida Health ("Kaleida") on June

---

[1]  Although defendants' motions to strike plaintiff's expert report are non-dispositive motions, I have addressed them in this Report, Recommendation and Order because they are related to the motions for summary judgment. See Carnrite v. Granada Hosp. Group, Inc., 175 F.R.D. 439, 441 n. 1 (W.D.N.Y. 2001) (Arcara, J.).

18, 2001 as a Human Resources Information Systems ("HRIS") Analyst in Kaleida's Human Resources Department (Dkt. #57-5, Ex. B, ¶17, Ex. E, ¶5). Plaintiff's work visa and her application for permanent residency were sponsored by Kaleida (Dkt. #50, ¶19).

Defendant Aaron Kopinski was a Senior HRIS Analyst at Kaleida (Dkt. #48-3, ¶2). Plaintiff alleges that shortly after she began working at Kaleida, Mr. Kopinski began a series of unwelcome sexual advances which culminated on June 18, 2002, when Mr. Kopinski allegedly sexually assaulted her at work (Dkt. #1, ¶¶21, 25-26). Their sexual encounters, which occurred at work, at Mr. Kopinski's apartment, and even at plaintiff's home, continued regularly through approximately March 23, 2003, when plaintiff learned that Mr. Kopinski was also having sexual relations with their co-worker, Dhana Hannibal (Dkt. #46, Ex. X, ¶¶3-4). When the two women confronted Mr. Kopinski, an enraged plaintiff bit him (Dkt. 46, Ex. X, ¶¶3, 6-7).

The next day, Mr. Kopinski reported the relationship to his supervisor, Denise Martin (Dkt. #43, ¶48; Dkt. #48-3, ¶10). When Ms. Martin questioned plaintiff, who had never complained to anyone at Kaleida about Mr. Kopinski's sexual advances, she alleged that the relationship was not consensual (Dkt. #43, ¶49). Several days later, while plaintiff and Mr. Kopinski were on paid leave pending Kaleida's investigation (Dkt. #43, ¶49), plaintiff filed an EEOC charge against Kaleida alleging harassment due to her gender and national origin (Dkt. #46, Ex. Y). On March 28, 2003, Mr. Kopinski voluntarily resigned his position from Kaleida, effective April 18, 2003, which terminated Kaleida's investigation (Dkt. #43, ¶56; Dkt. #48-3, ¶10; Dkt. #50, ¶¶32-33). Plaintiff continued her employment at Kaleida until March 25, 2005, when she voluntarily resigned (Dkt. #43, ¶7).

Plaintiff commenced this action on June 22, 2004, alleging six causes of action:

1. Violations of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000(e) *et seq.* (Dkt. #1, ¶¶35-42);

2. Creation of a hostile work environment in violation of the New York State Human Rights Law (New York Executive Law §296 *et seq.*) (Id., ¶¶43-50);

3. Aiding and abetting in violation of the New York State Human Rights Law (Id., ¶¶51-56);

4. Retaliation for complaints of discrimination, sexual harassment and/or a hostile work environment, in violation of Title VII (Id., ¶¶57-61);

5. Retaliation in violation of the New York State Human Rights Law (Id., ¶¶62-66); and

6. Intentional infliction of emotional distress (Id., ¶¶67-71).

Following completion of pre-trial discovery, these motions ensued.

### DISCUSSION AND ANALYSIS

A. **Summary Judgment Standard**

The standard to be applied on a motion for summary judgment in this Circuit is well settled. "'Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must

examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

However, in order to defeat a motion for summary judgment, "the issue of fact must be 'genuine'". Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "Summary judgment is called for where 'it clearly appears that the issues are not genuine, but feigned.'" United National Insurance Co. v. The Tunnel, Inc., 988 F. 2d 351, 354 (2d Cir. 1993); Feick v. Fleener, 653 F. 2d 69, 77 (2d Cir. 1981)("[c]ourts . . . cannot be swayed by feigned issues").

Thus, the question before me on this motion is "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented". Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial' ", and the motion must be granted. Matsushita, supra, 475 U.S. at 587.

**B.    Plaintiff's First and Second Causes of Action**

Plaintiff's first and second causes of action allege that plaintiff was subject to a pattern or practice of sexual harassment based on gender and national origin that gave rise to a hostile work environment, in violation of Title VII and the New York Human Rights Law.

(Dkt. #1, ¶¶35-50). "The standard governing sex discrimination claim is the same whether pursued under Title VII or the Human Rights Law." Prystajko v. Lowe's Home Centers, Inc., No. 05-CV-6271, 2007 U.S. Dist. LEXIS 17431 *13, n. 6 (W.D.N.Y. March 13, 2007) (Telesca, J.); Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1158 (E.D.N.Y. 2003) ("In the determination of whether sexual harassment has occurred, claims brought under Title VII and the NYHRL can be evaluated identically.").

Title VII recognizes two forms of sexual harassment: "direct discrimination (the so-called 'quid pro quo' variety) . . . and 'hostile workplace environment' harassment". Leibovitz v. New York City Transit Authority, 252 F. 3d 179, 188 (2d Cir. 2001). To establish a "quid pro quo" claim, plaintiff must show a "that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment". Fitzgerald v. Henderson, 251 F. 3d 345, 356 (2d Cir. 2001), cert. denied, 536 U.S. 922 (2002) (internal quotation marks omitted). A "hostile work environment" claim requires plaintiff to demonstrate: "(1) that she is a member of a protected group; (2) that she was the subject of unwelcome advances; (3) that the harassment was based upon her sex; and (4) that the harassment affected a term, condition or privilege of employment." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1042 (2d Cir. 1993).

Thus, in order to prevail under either test, plaintiff must prove that defendant Kopinski's conduct was "unwelcome". "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 68, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986).

### 1. Was Defendant Kopinski's Conduct "Unwelcome"?

The issue of whether defendant Kopinski's sexual advances were "unwelcome" for purposes of Title VII cannot be determined by reference to plaintiff's subjective state of mind. Instead, "[t]he correct inquiry is whether [plaintiff] *by her conduct indicated* that the alleged sexual advances were unwelcome." Meritor, supra, 477 U.S. at 68 (emphasis added); plaintiff's memorandum of law (Dkt. #57-9) at p. 15. "When welcomeness is at issue . . . . [t]riers of fact rely on objective evidence, rather than subjective, uncommunicated feelings." EEOC Policy Guidance on Current Issues of Sexual Harassment, No. N-915-050, 1990 WL 1104701 *5 n. 10 (March 19, 1990). Thus, in order to prevail, plaintiff "must show that at some point she clearly made her co-workers and superiors aware that in the future such conduct would be considered 'unwelcome'". Weinsheimer v. Rockwell International Corp., 754 F. Supp. 1559, 1564 n. 12 (M.D. Fla. 1990), aff'd 949 F. 2d 1162 (11th Cir. 1991); Loftin-Boggs v. City of Meridian, 633 F. Supp. 1323, 1327 n. 8 (S.D. Miss. 1986) (plaintiff "must be able to identify with some precision a point at which she made known to her co-workers or superiors that such conduct would henceforth be considered offensive").

Whether a fair-minded jury could rationally find from plaintiff's conduct that she considered Kopinski's actions "unwelcome" must be determined "in light of 'the record as a whole' and 'the totality of the circumstances' " (Meritor, supra, 477 U.S. at 69), including the voluminous e-mails sent by plaintiff to Kopinski over the course of a year, both before and after the alleged June 18, 2002 assault.[2] Among them are the following:

---

[2]   The e-mails were exchanged using their work e-mails and plaintiff's Yahoo e-mail account "enigma 14094", wherein she used the alias "Syndy" (Dkt. #48-5, Ex. 45, pp. 50-51). At oral argument, plaintiff's attorney conceded the authenticity of the e-mails.

- March 6, 2002: "ur happiness very important to me" (Dkt. #46, Ex. T, p. 7);

- March 29, 2002: "sth [something] is bothering u if it was me, i will leave u alone" (Id., p. 14);

- June 12, 2002: "all i want is to make us happy . . . just have fun with me" (Id., p. 30);

- June 13, 2002: "say sth [something] to make my guilty go away . . . u make me laugh, sweetie" (Id., p. 38);

- June 24, 2002 (approximately a week after the alleged sexual assault): "i am disappointed about the fact u regretted though, i knew u would" (Id., p. 54);

- June 28, 2002: "i cant be the one always trying to make u happy. if u cant take time off for me and urself, it is fine. ur call, ur loss" (Id., p. 73);

- August 23, 2002: "u can't hang out with me outside work, then. too much temptation :)" (Id., p. 95);

- September 25, 2002: "Life is beautiful because you are here with me" (Id., p. 117);

- September 30, 2002: "ytrid eivom [dirty movie][3] in ur notebook? never watched one before . . . is it good? . . . show me the good ones" (Id., p. 121);

- October 23, 2002: "thank you to make me happy . . . i am very happy in my personal life . . . to lose u is the last thing i want to see in my life" (Id., pp. 135-136);

- October 24, 2002: "i want XES [sex][4] now!!!!!!!!!!" (Dkt. #62, Ex. 3B);[5]

- October 25, 2002: "love me more and more everyday"(Dkt. #46, Ex. T, p. 151);

- October 28, 2002: "when i need u, where are you, when i cry for u, where r u, when i need ur real feeling to help me go through tough time, where r u, when i need to make

---

[3]  For reasons best known to themselves, plaintiff and Kopinski occasionally e-mailed backwards.

[4]  See footnote 3.

[5]  In a separate Decision and Order filed today (Dkt. #90), I have granted defendant Kopinski's motion (Dkt. #69) to withdraw his counterstatement of facts (Dkt. #62) and replace it with a version eliminating language which plaintiff's attorney considered to be personally objectionable. However, there are no changes in the substantive content of the counterstatement, or in the exhibits attached thereto.

very important decision and need ur support and love, where r ur words? when i offered wiht my whole hearted, where is ur taking? when i need to talk to u about future, where r u. when i am desperate, where r u? do u ever have time for us?" (Id., p. 159);

- November 20, 2002: "is it possible that we will be able to set up our own business in the future? that would be awesome if we can." (Id., pp. 178-179);

- November 20, 2002: "if someday i wanted to travel the world. would you like to come along?" (Id., p. 184);

- November 25, 2002: "She is waiting for the answer from him: whether or not he wants her for the life time. Is answer is yes, and she accepts, then she will have to separate totally from the current life which includes everything and the person legally bonded to her now to show him she is serious, and waiting to get legally bonded to him very shortly. If answer is no, then she will continue her current life, and a baby will be coming very soon within a couple of months" (Dkt. #46, Ex. V, pp. 10-11);

- December 6, 2002: "terminate current marriage - get legal marriage certificate with you right away. move in with you - file for immigration status to get green card - while waiting for green card issued, introduce me to your family as girlfriend, spending time to get know each other. Wait till issuance of green card, fly back to China with me telling my family we are legally bonded, and you are the one I can love and lean on for rest of my life" (Id., p. 16);

- December 6, 2002: "To your family, I am just a girlfriend, we take time to work together to make the acceptance and final ceremony happen. To my family, you make your promise by legally marrying me instead of 'playing with me in their eyes' to love me forever, then they won't have too much space in the middle ground to consider by pushing me back to Ran [her husband]" (Id., p. 16);

- December 8, 2002: "Everything goes to one point, as long as i want to be with you, we have to get this issue resolved . . . . The only way is we have to get legally married. With the paper, you can file permanent residency application for me." (Id., pp. 1-2);

- December 9, 2002: "Wo Aye Nee. Can you pronounce that? for me?:) That is Chinese 'u evol I'[6]. . . Is there any words stronger than love? i just wanted you to know I want to find a better and unique word to tell you how I feel" (Dkt. #46, Ex. T, pp. 201-202); and

---

[6]   "I love you" spelled backwards.

- December 9, 2002: "Can I not think of you? . . . . I need you babe . . . . I wonder if I can make it more clear to you that love is a such refreshing and wonderful thing. The only thing I devote to you is my true heart for you. Even the end of day comes, I wouldn't leave you. That's my promise to you." (Letter from plaintiff to Kopinski, Dkt. #46, Ex. U).

In addition, plaintiff testified that she told Kopinski that she was separated from her husband (Dkt. #48-5, Ex. 3, p. 287); that she told her parents that she was thinking about leaving her husband (Id., p. 315); that Kopinski spent the night at her house while her husband was away (Dkt. #48-5, Ex. 3, p. 257), that she wore Kopinski's pajama bottoms in his bedroom (Id. at p. 254 ); and that she went to Kopinski's apartment during the evening and during lunch to have intercourse (Id. at pp. 245-6). Even plaintiff's husband recognized the true nature of the relationship between plaintiff and Kopinski: "[Y]ou developed your feeling to an affair and you encouraged him to pursue you in some way . . . . You nearly gave up all you have for him or for something (I call it fantasy or vanity) in your heart . . . . [T]he affair you two developed is an evil thing . . . . Stop it, cut it off! For your own good." (Dkt. #46, Ex. T, pp. 211-12).

Plaintiff attempts to counter the overwhelming force of her own words and actions by claiming that she "was scared that if I did not submit to his advances or withdrew from the relationship, he would negatively impact my job evaluation and threaten my immigration status. I felt trapped and helpless." (Dkt. #57-5, Ex. E, ¶38). "Plaintiff was terrified that she would lose her job and be deported if she did not please and obey Kopinski." (Dkt. #57-9, p. 4). Not only are these assertions contradicted by plaintiff herself ("I repeatedly rejected Kopinski's unwelcome advances and told him to stop communicating with me unless it was work related") (Dkt. #57-5,

Ex. E, ¶45)[7], but they are again belied by her own e-mails, whose author was anything but "terrified" of Kopinski:

- December 10, 2001: "Don't i make myself clear enough? You are not allowed to go" (Dkt. #62-2, Ex. 13);

- May 24, 2002: "can you give me a little bit more patience instead of pissing me off and ruining my mood?" (Dkt. #57-5, Ex. U);

- May 24, 2002: "don't be like a kid, i have no idea why u r upset sometimes, most of the time actually." (Id.)

- June 12, 2002: "why cant u be simple? i asked u a question, answer it. don't dance on it. do u or do u not. geez . . . ." (Dkt. #46, Ex. T, p. 24);

- June 18, 2002: "stop talking to the phone. talk to me" (Id., p. 52);

- June 28, 2002: "i cant be the one always trying to make u happy. if u cant take some time off for me and urself, it is fine. ur call, ur loss." (Id., p. 73);

- October 24, 2002: "shut up, a-hole" (Id., p. 143);

- October 28, 2002: "r we actually going anywhere? u tell me." (Id., p. 156); and

- October 28, 2002: "give me af-answer then. what is ur problem." (Id., p. 155).

In fact, the e-mail exchanges show that, far from being concerned about *losing* her job at Kaleida, plaintiff was planning to *leave* her job, because she was disappointed with her raise. On October 23, 2002, she told Kopinski: "i am seriously pissed. but i will find a way a out. just being sweet to me, that is all u need to do. i have to work now. i don't want to see me getting kicked out before i can land a decent one." (Dkt. #46, Ex. T, p. 136). Kopinski then told her that *he* was planning to leave, and offered her his job, but she begged him not to go:

---

[7] "A party cannot establish genuine issues of material fact merely by submitting contradictory statements regardless of the form they take." 11 Moore's Federal Practice (3d Ed. 2007) §56.13[2].

>   Kopinski: "when i leave you can have my job . . . u'll get ur 25% . . . just help me find a good one, pls . . . I am serious. u could have mine instantly . . . . I am going anyway".
>
>   Plaintiff: "i don't like this place. stop. to lose u is last thing i want to see in my life." (Id. pp. 136-137).

While plaintiff accuses defendants of quoting e-mail and other evidence "out of context" (Dkt. #57-9, p. 17), plaintiff herself has not been totally accurate in her characterization of the record. For example, while plaintiff argues that Kopinski "threatened that if she told her husband . . . about them, he would 'chop her husband's finger off' " (Dkt. #57-9, p. 20), she contradicted that argument in her deposition, testifying that this "threat" was made *after* her husband sent Kopinski an e-mail warning him to terminate the relationship with plaintiff (Dkt. #57-5, Ex. D, p. 302).[8]

Elsewhere, plaintiff alleges that on "January 7, 2002 at 2:13 a.m., [Kopinski] sent her an e-mail that threatened" her (Dkt. #57-9 at p. 22, quoting portions of an e-mail from Kopinski dated January 7, 2003, not 2002). However, when read in its entirety, that e-mail contained no threats whatsoever; in it, Kopinski asked plaintiff to decide whether their relationship should continue or terminate, and stated that the choice was entirely hers:

>   "If you choose that you want to be with me before noon today . . . I will have you back and forget everything that has happened. If you can not do so cleanly and w/o carrying over events from the past . . . don't even bother trying to talk to me. I'm am completely prepared to accept your decision regardless of outcome. But be clear that this is your decision. The ball is in your court . . . . If you can not accept all of these terms unconditionally, then walk

---

[8] Kopinski testified that upon receipt of the e-mail, plaintiff asked him "what are you going to do to stick up for me or what can you do to protect me, that sort of thing. And I remember we . . . jokingly referred [to] something about his fingers . . . I would do something to his fingers at the most in a joking standpoint would be about what was said." (Dkt. #57-5, Ex. G, p. 168).

-11-

away. It is not what I want. I have made it clear to you that I want to spend the rest of my life with you . . . . You are a free woman now . . . . You have no one to answer to but yourself. Let's see how you handle it." (Dkt. #57-5, Ex. U, p. 9).

In opposition to the summary judgment motion, plaintiff also offers the opinion of a forensic psychologist, Charles Patrick Ewing, J.D., Ph.D. Defendants have moved to strike that opinion (Dkt. #72), and plaintiff argues that the motion is an improper sur-reply (Dkt. #79-4, p. 6). Plaintiff's objection to the motion is unfounded, for two reasons: first, this Court's scheduling order did not set a deadline for motions to preclude expert testimony; and secondly, whether or not defendants had moved to strike Dr. Ewing's opinion, it would still be necessary for me to determine whether that opinion is admissible in opposition to the motion. See Fed. R. Civ. P. 56(e) ("opposing affidavits . . . shall set forth such facts as would be admissible in evidence"); 11 Moore's Federal Practice, supra, §56.14[1][e] ("expert opinions and conclusions set forth in affidavits must contain admissible evidence").

Dr. Ewing evaluated plaintiff "to determine, if possible, why [plaintiff] did not report the alleged abuse earlier or take steps earlier to end it", and "what, if any, psychological harm she has experienced as a result of the alleged abuse" (Dkt. #57-5, Ex. BB, p. 1).[9] However, this expert evidence is admissible only if it "rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993). The "task at hand" on this motion is to determine whether

---

[9] While defendants argue that Dr. Ewing's report should be disregarded because it was not in evidentiary form, Dr. Ewing testified concerning the report in his deposition, and submitted an affidavit stating that the report "accurately reflects my expert opinion in this case, which is the same opinion . . . that I testified about during my deposition." (Dkt. #79-3, ¶12). Therefore, that basis for exclusion of his report is rejected.

a jury could rationally conclude that defendant Kopinski's conduct was "unwelcome", i.e., whether plaintiff "by her conduct *indicated* that the alleged sexual advances were unwelcome". Meritor, supra (emphasis added); see also Weinsheimer, supra, and Loftin - Boggs, supra. By definition, Dr. Ewing's attempt to explain why plaintiff did *not* complain or take steps to end the alleged abuse cannot possibly be relevant to that issue.

Even if Dr. Ewing's opinion could be considered relevant to the issue raised by this motion, it would still not "rest[ ] on a reliable foundation", as required by Daubert, supra. "Expert opinions based on insufficient facts or data . . . [are] not acceptable." Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1136 (E.D.N.Y. 2006). Dr. Ewing stated that "the diagnostic interview and examination is the primary tool I use as a basis for my evaluation". (Dkt. #79-3, ¶9). He did not review plaintiff's deposition testimony (Dkt. #73-1, Ex. B, p. 31), nor did he review all of the e-mails between plaintiff and Kopinski (Id., p. 65). In fact, some of the assumptions contained in his report are directly contradicted by the e-mails which plaintiff sent to Kopinski. For example, whereas Dr. Ewing concludes that Kopinski "psychologically abused [plaintiff] by forcing her to watch pornography on his computer and taking her to a bar and demanding that she consume alcohol against her wishes" (Dkt. #79-3, Ex. D, p. 3), the e-mails from plaintiff indicate that *she* asked Kopinski to show her the pornographic videos ("[dirty movie] in your notebook, is it good? show me the good ones") (Dkt. #46, Ex. T, p. 121), and that *she* suggested that Kopinski meet her at a bar:

> "place:  somewhere she knows how to find the place and meet him
> first . . . . pearl  street is good, too far though. `tully's, close, too
> many familiar faces.  suggestion: stay in a bar to wait for her,
> meanwhile he can kill time by checking out hotties:)" (Id., p. 174).

"Drawing all inferences in favor of the non-moving party does not require the court to accept mis-characterizations of the actual record." Diepenhorst v. City of Battle Creek, No. 05-CV-734, 2000 WL 1141492, *2 (W.D. Mich. April 17, 2007).

This Court has recognized that "the expert must . . . be 'reasonably confined to his subject expertise'". Prohaska v. Sofamor, S.N.C., 138 F. Supp. 2d 422, 435 (W.D.N.Y. 2001) (Curtin, J.). Dr. Ewing clearly exceeded his "subject expertise" in opining as to why plaintiff did not report the alleged abuse. For example, he stated that "one of the major reasons" for her failure to report the abuse "was her own background as an immigrant to this country and growing up in a separate culture. And having been socialized, I believe, in a culture where males are dominant." (Dkt. #65, Ex. C, pp. 72-3). However, he admitted that he is "not claiming to be an expert on the effect of abuse on traditional Chinese women". (Dkt. #79-1, Ex. A, p. 76). Therefore, he is not competent to express this opinion. See Jinro America Inc. v. Secure Investments, Inc., 266 F. 3d 993, 1006 (9th Cir. 2001) (finding that a commercial investigator was not qualified to render an expert on Korean business culture and practices where he had limited experience and knowledge on this subject).

Moreover, although he testified that it was not part of his function to determine whether plaintiff was telling the truth or whether she had been sexually abused (Dkt. #79-4, p. 11), Dr. Ewing proceeded to do just that, concluding that the plaintiff was credible and that she had been sexually abused (Dkt. #82, pp. 5-6). This he may not do. "[E]xpert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." Nimely v. City of New York, 414 F. 3d 381, 398 (2d Cir. 2005); see also Garcia v. Los Banos Unified School District, No. 1:04-CV-

6059-SMS, 2007 WL 715526, *4 (E.D. Cal. March 8, 2007) ("[I]t is established that because it is the province of the jury to determine credibility, opinions that are nothing more than vouchers for or attacks on credibility (such as that sexually harassment occurred as alleged by the victim) do not assist the trier of fact"). For all of these reasons, Dr. Ewing's opinion must be excluded.

In order "to defeat a motion for summary judgment, a plaintiff must rely on more than mere conclusory allegations that the discrimination occurred. 'Indeed, the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation.'" Prystajko, supra, 2007 U.S. Dist. LEXIS 17431 at *12 (quoting Meiri v. Dacon, 759 F. 2d 989, 998 (2d Cir. 1985), cert. denied, 474 U.S. 829 (1985)). Considering the record in its entirety, I conclude that no rational fact finder could find that plaintiff "by her conduct indicated that the sexual advances were unwelcome" (Meritor, supra), notwithstanding plaintiff's conclusory assertions to the contrary. "[A] court is not obligated to credit a litigant's statement . . . that flies so squarely in the teeth of the litigant's own prior unequivocal statements and conduct." Brasco, Inc. v. International Graphic Services, Inc., 602 F. Supp. 129, 135 (N.D. Ill. 1984); see also McCarthy v. New York City Technical College, 202 F. 3d 161, 166 (2d Cir. 2000) ("[T]he several scraps of evidence on which the plaintiff's case depends do not sufficiently support the inference that the defendant acted [improperly]. We have considered them, as we must, in the aggregate, and conclude that, taken together, they do not support a reasonable jury finding in plaintiff's favor.").

C.  **Plaintiff's Remaining Causes of Action**

Because I conclude that the record cannot reasonably support a finding that defendant Kopinski's advances were "unwelcome" by plaintiff, I recommend that plaintiff's causes of action for sexual harassment be dismissed. For the same reason, plaintiff's remaining causes of action (for aiding and abetting, retaliation,[10] and intentional infliction of emotional distress) should likewise be dismissed, since they depend upon a finding that sexual harassment occurred.[11] Having concluded that there is no actionable misconduct by Kopinski, there is no reason for me to decide whether Kopinski's conduct can be imputed to Kaleida.

## CONCLUSION

For these reasons, I recommend that defendants' motions for summary judgment (Dkt. ##42, 48) be GRANTED, and that plaintiff's cross-motion for partial summary judgment (Dkt. #57) be DENIED, and I order that defendants' motions to preclude Dr. Ewing's expert report and testimony (Dkt. ##72, 76) be GRANTED. Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

---

[10] The only adverse action alleged by plaintiff is Kopinski's alleged sexual harassment (Dkt. #46, Ex. B, pp. 45-47 (plaintiff conceded that she never received a pay cut, was not demoted, disciplined, or terminated during her employment with Kaleida)).

[11] Plaintiff's claim for intentional infliction of emotional distress is also barred by the one-year statute of limitations, N.Y. C.P.L.R. §215(3). It is undisputed that the alleged conduct terminated prior to Mr. Kopinski's last day of employment with Kaleida on April 18, 2003, yet plaintiff's complaint was not filed until June 22, 2004 (Dkt. #1). While plaintiff argues that the filing of her EEOC charge tolled the statute of limitations, this argument fails. See Gardner v. St. Bonaventure University, 171 F. Supp. 2d 118, 131 (W.D.N.Y. 2001) (Arcara, J.) ("the one-year limitations period applicable to intentional tort claims in New York was not tolled while [plaintiff's] EEOC charge was pending").

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.

**SO ORDERED.**

DATED:     August 8, 2007

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge